# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2013-1084

## CENTILLION DATA SYSTEMS, LLC

Plaintiff-Appellant

v.

## QWEST COMMUNICATIONS INTERNATIONAL, INC., QWEST CORPORATION, and QWEST COMMUNICATIONS CORPORATION

Defendants-Appellees.

Appeals from the United States District Court for the Southern District of Indiana in Consolidated Case Nos. 04-CV-0073 and 04-CV-2076, Senior Judge Larry J. McKinney

---

## DEFENDANTS-APPELLEES' CORRECTED NON-CONFIDENTIAL RESPONSE BRIEF

---

Dated: April 26, 2013

MORRISON & FOERSTER LLP
Vincent J. Belusko
555 West 5th Street, Suite 3500
Los Angeles, CA 90013
P:      (213) 892-5200
F:      (213) 892-5454
vbelusko@mofo.com

Attorneys for Defendants-Cross Appellants
*QWEST COMMUNICATIONS INTERNATIONAL, INC., QWEST CORPORATION, AND QWEST COMMUNICATIONS CORPORATION*

FORM 9. Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Centillion Data Systems, LLC _____ v. Qwest Communications Int'l, Qwest Corp.,

and Qwest Communications Corp.

No. 2013-1084

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Vincent J. Belusko _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Qwest Corporation, Qwest Communications International, Inc., and Qwest Communications Corporation, n/k/a Qwest Communications Company, LLC.  Qwest merged with CenturyLink, Inc. and all Qwest entities are indirect subsidiaries of CTL, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

CenturyLink, Inc.

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Vincent J. Belusko, Hector G. Gallegos, J. Manena Bishop, E. Dale Buxton (Morrison & Foerster LLP); James W. Riley, Jr. (Riley, Bennett & Egloff)

|     April 26, 2013     | /s/ Vincent J. Belusko |
| :---: | :---: |
| Date | Signature of counsel |
|  | Vincent J. Belusko |
|  | Printed name of counsel |

Please Note: All questions must be answered
cc: P. Honigberg, V. Wigman, K. Bressler _____

# TABLE OF CONTENTS

<div align="right">**Page**</div>

I.    STATEMENT OF RELATED CASES..........................................................1

II.   STATEMENT OF THE ISSUES .............................................................1

III.  STATEMENT OF THE CASE ................................................................4

IV.  STATEMENT OF THE FACTS ..............................................................6

     A.    The Patent in Suit ......................................................................6

     B.    The LOGIC and eBill Companion Systems...........................12

          1.    eBC .TXT files and .FMT files...............................13

          2.    On Demand ...............................................................15

          3.    Project Account Codes...............................................16

          4.    eBC Data File Updates..............................................17

     C.    Centillion's Motion for Summary Judgment .......................18

     D.    Qwest's Opposition to Centillion's Motion for Summary
          Judgment ..................................................................................19

     E.    The District Court's Summary Judgment Ruling ...............20

V.    SUMMARY OF THE ARGUMENT.........................................................24

VI.  ARGUMENT........................................................................................31

          1.    The district court properly found that "as specified by the
                user" is an active limitation.....................................31

          2.    The district court properly found that PAC cannot meet
                the "as specified by the user" limitation .................32

     B.    The District Court Properly Granted Summary Judgment of
          Non-Infringement by the eBC System...........................37

           1.    The district court properly found that infringement
                requires Qwest's client application software be installed
                on a user's PC .........................................................37

          2.    The district court properly found that "customizations"
                cannot meet the "as specified by the user" limitation..............39

# TABLE OF CONTENTS
## (continued)

Page

3. The district court erroneously found that On Demand satisfies the "as specified by the user" limitation ...................42

4. Even assuming On Demand satisfies the "as specified by the user" limitation, there is no evidence of an eBC customer using On Demand and having the Qwest client application installed .................................................................43

5. The district court granted summary judgment on an issue that was raised in Centillion's own motion for summary judgment...............................................................................44

    a. Centillion was on notice that the .TXT file was not in the proper format to satisfy the data processing means ...........................................................................45

    b. The district court granted summary judgment because the .TXT file was not in the proper format to satisfy the data processing means..............................47

    c. Centillion's challenge to the district court's claim constructions is unfounded and untimely .....................48

    d. The alleged eBC "data processing means" does not organize the .TXT file into a format for storage manipulation and display...............................................51

    e. Centillion's proffered evidence fails to create an issue of material fact as to whether the .TXT file is in a "database table" format...........................................53

6. The district court erroneously found that the .TXT file satisfies the "summary report" limitation ................................56

C. The District Court Did Not Abuse Its Discretion in Awarding Qwest's Costs Pursuant to 28 U.S.C. 1920........................................57

1. Centillion must prove that the district court abused its discretion in determining the amount of costs .........................57

# TABLE OF CONTENTS
(continued)

2. The district court properly held that the costs requested by Qwest were recoverable under 28 U.S.C. § 1920 and provided sufficient explanation of its rationale .......................59

3. Qwest properly substantiated its request for costs...................60

   a. Requirements to Substantiate Request for Photocopy/Imaging/Printing Costs................................60

   b. Requirements to Substantiate Request for Court Reporter/Transcription Costs.........................................61

   c. Qwest's Requests for Costs Were Properly Substantiated.................................................................61

4. Centillion's Procedural Error Arguments are Meritless ..........66

VII. CONCLUSION............................................................................67

## CONFIDENTIAL MATERIAL OMITTED

The material omitted from pages 13-15, 17-21, 23, 26, 40-41, 43-44, 46, 52-55, and 57 contain technical and/or proprietary information, and/or cites a document or deposition testimony designated by Qwest as either "CONFIDENTIAL," "ATTORNEY CONFIDENTIAL," or "ATTORNEYS' EYES ONLY."

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acequia, Inc. v. Prudential Ins. Co. of Am.*,
   226 F.3d 798 (7th Cir. 2000) ........................................................45

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*,
   692 F.3d 1301 (Fed. Cir. 2012) .....................................................5

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) .......................................................39

*Amadio v. Ford Motor Co.*,
   238 F.3d 919 (7th Cir. 2001) .......................................................56

*Amado v. Microsoft Corp.*,
   517 F.3d 1353 (Fed. Cir. 2008) ....................................................50

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. Mar. 28, 2008)........................................11

*Barber v. Ruth*,
   7F. 3d 636, 644 (7th Cir. 1993) ...................................................58

*Cengr v. Fusibond Piping Systems*,
   135 F.3d 445 (7th Cir. 1998)..........................................58, 59, 61

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
   631 F.3d 1279 (Fed. Cir. 2011) ............................................. passim

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
   836 F.2d 1320 (Fed. Cir. 1987) .......................................25, 27, 32

*Dynacore Holdings Corp. v. U.S. Philips Corp*,
   363 F.3d 1263 (Fed. Cir. 2004) ....................................................22

*E.E.O. C v. Yellow Freight Sys., Inc.*,
   253 F.3d 943 (7th Cir. 2001).......................................................56

*Ericsson, Inc. v. Harris Corp.*,
   146 F. App'x 476 (Fed. Cir. 2005)................................................51

# TABLE OF AUTHORITIES
(continued)

<div align="right">**Page(s)**</div>

*Garlington v. O'Leary,*
  879 F.2d 277 (7th Cir.1989) ............................................................................64

*Goldstein v. Fid. & Guar. Ins. Underwriters, Inc.,*
  86 F.3d 749 (7th Cir. 1996) .......................................................................44, 46

*Halasa v. ITT Educ. Services, Inc.,*
  1:10-CV-437-WTL-MJD, 2012 WL 639520 (S.D. Ind. Feb. 27, 2012)
  *aff'd,* 690 F.3d 844 (7th Cir. 2012) .........................................................62, 65

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
  527 F.3d 1379 (Fed. Cir. 2008) ......................................................................49

*In re Ricoh Co., Ltd. Patent Litigation,*
  661 F. 3d 1361 (Fed. Cir. 2011) .....................................................................59

*Intamin Ltd. v. Magnetar Techs., Corp.,*
  483 F.3d 1328 (Fed. Cir. 2007) ......................................................................49

*Jones v. Union Pac. R. Co.,*
  302 F.3d 735 (7th Cir. 2002) .....................................................................45, 46

*Laitram Corp. v. Rexnord, Inc.,*
  939 F.2d 1533 (Fed. Cir. 1991) ......................................................................50

*Local 15, Int'l Broth. of Elec. Workers, AFL-CIO v. Exelon Corp.,*
  495 F.3d 779 (7th Cir. 2007) ..........................................................................64

*M.T. Bonk Co. v. Milton Bradley Co.,*
  945 F.2d 1404 (7th Cir. 1991) ........................................................................59

*Majeske v. City of Chicago,*
  218 F. 3d 816 (7th Cir. 2000) .....................................................................58, 59

*North Am. Vaccine, Inc. v. American Cyanamid Co.,*
  7F.3d 1571 (Fed. Cir. 1993) ..........................................................................50

*Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,*
  924 F.2d 633 (7th Cir. 1991) ................................................................60, 61, 63

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO.*
335 F.3d 643 (7th Cir. 2003) ...............................................................................44

*Soo Line R. Co. v. St. Louis Sw. Ry. Co.,*
125 F.3d 481 (7th Cir. 1997)...............................................................................39

*Summit Technology, Inc. v. Nidek Co., Ltd,*
435 F.3d 1371 (Fed. Cir. 2006) ...........................................................................61

*SuperGuide Corp. v. DirecTV Enterprises, Inc.,*
358 F.3d 870 (Fed. Cir. 2004) .............................................................................50

*Symantec Corp. v. Computer Associates Int'l, Inc.,*
522 F.3d 1279 (Fed. Cir. 2008) ...........................................................................53

*Tronzo v. Biomet, Inc.,*
236 F.3d 1342 (Fed. Cir. 2001) ...........................................................................51

*United States v. Cunningham,*
405 F.3d 497 (7th Cir. Ind. 2005) .......................................................................39

*United States v. One Heckler-Koch Rifle,*
629 F.2d 1250 (7th Cir. 1980) ............................................................................39

*Weeks v. Samsung Heavy Indus. Co., Ltd.,*
126 F.3d 926 (7th Cir. 1997)...............................................................................59

*Weihaupt v. American Medical Ass'n,*
874 F.2d 419 (7th Cir. 1989) ..............................................................................58

**STATUTES**

28 U.S.C. §. 1920............................................................................................... passim

Federal Rule of Civil Procedure 54(d)................................................................58

## I.    STATEMENT OF RELATED CASES

This Court has previously decided an appeal in this case involving the same parties. In case numbers 2010-1110,-1131, this Court vacated-in-part, reversed-in-part, and remanded the district court's grant of Qwest's[1] Motion for Summary Judgment of Non-Infringement and Centillion's[2] Motion for Partial Summary Judgment of No Anticipation.  The Court filed its opinion on January 20, 2011. The panel consisted of Judges Lourie, Linn, and Moore, with Judge Moore writing the panel opinion. *See Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011).  No pending cases known to counsel in this or any other court will directly affect or be directly affected by the decision of this appeal.

## II.    STATEMENT OF THE ISSUES

1) Did the district court, in granting summary judgment of non-infringement by Qwest's LOGIC system, correctly find that Project Account Codes (PAC) cannot meet the "as specified by the user" limitation for either LOGIC or Qwest's eBill Companion (eBC) system where (a) it is undisputed that Qwest's customers' use of

---

[1] The terms "Qwest" and "Qwest Defendants" refer to the defendants, Qwest Communications Int'l, Inc. and Qwest Corp., and to the consolidated plaintiffs, Qwest Corp. and Qwest Communications Corp. n/k/a Qwest Communications Company, LLC.  Qwest merged with CenturyLink, Inc. many years after the commencement of this litigation.  All of the Qwest entities are indirect subsidiaries of CTL, Inc.

[2] "Centillion" refers to Centillion Data Systems, LLC.

PACs is configured completely outside of LOGIC and eBC,

customers may enter a PAC when placing a call but they are not

required to do so, and a field for PACs is included in the billing

information provided by Qwest in conjunction with LOGIC or eBC

even if customers choose not to enter a PAC; and (b) the applicants

conceded during prosecution of the asserted U.S. Patent No.

5,287,270 (the "'270 Patent") that the use of PACs was in the prior

art?

2)  Did the district court, in granting summary judgment of non-

infringement by Qwest's eBC system, correctly find that

"customizations" of eBC data files cannot meet the "as specified by

the user" limitation where (a) "customizations" cannot be used with

Qwest's client application software, and (b) Centillion conceded,

before this Court, that in order to infringe the customer must install

and use Qwest's client application software?

3)  Did the district court err in finding that using On Demand, a free

online feature available to customers regardless of whether they install

the Qwest application, and which merely provides a copy of the

information for a fixed billing period already made available to the

customer, satisfies the "as specified by the user" limitation?

4)   Is summary judgment of non-infringement by Qwest's eBC system also appropriate because there is no evidence of any eBC customer using On Demand and having the Qwest client application installed?

5)   Did the district court correctly grant summary judgment of non-infringement by eBC, where (a) Qwest's opposition to Centillion's motion for summary judgment put Centillion on notice that the files generated by the eBC Back Office and LATIS did not satisfy the requirements of the "data processing means" as construed by the district court; (b) Centillion had an opportunity to present evidence and argument regarding this claim element, which Centillion had itself raised in its own summary judgment motion; (c) there is no material issue as to the fact that the files generated by eBC Back Office and LATIS fail to satisfy the "database tables" requirement of this claim element; and (d) Centillion failed to timely appeal the district court's construction of this claim element?

6)   Did the district court err in finding that the .TXT file satisfies the "summary report" limitation?

7)   Did the district court abuse its discretion in awarding Qwest its costs in the amount of $251,245.92, where the case has been pending for nine years and the district court found the proffered costs were

reasonable and necessary?

## III.   STATEMENT OF THE CASE

On January 9, 2008, the district court issued its claim construction order. (A411-458.)  On October 29, 2009, the district court filed an Amended Order that, *inter alia*, granted Qwest's Motion for Summary Judgment of Non-infringement of all associated claims for both direct and indirect infringement, denied Centillion's Motion for Partial Summary of Infringement, denied Qwest's Motion for Summary Judgment of Invalidity of the '270 patent in view of NYNEX's TRACE/COBRA prior art, and granted Centillion's Motion for Partial Summary Judgment of No Anticipation in view of NYNEX's TRACE/COBRA prior art.  (A1243-1280.) Thereafter, on November 3, 2009, the district court filed an Entry of Judgment that dismissed Centillion's claims with prejudice and found that Centillion should take nothing by way of its complaint.  (A5270-72.)  On January 26, 2010, the district court filed an Entry of Amended Judgment, which restated its prior judgment and dismissed, without prejudice, Qwest's then still-pending affirmative defenses and declaratory judgment claims.  (A5273-74.)

Centillion filed its notice of appeal on November 30, 2009, but did not appeal the district court's claim construction.  (A1296-1345.)  On December 11, 2009, a notice of cross-appeal was filed by Qwest.  (A5267-69.)

The Court filed its Decision on the first appeal on January 20, 2011.  631

4

F.3d 1279 (Fed. Cir. 2011).  The Court held that Qwest could not be a direct

infringer as a matter of law (631 F.3d at 1287, 1288) and remanded on the issue of

indirect infringement[3] (631 F.3d at 1281, 1286).  In remanding, the Court noted

"Centillion concedes that in order to infringe, the customer must install Qwest's

client software."  631 F.3d at 1286, n.6.  The Court further stated "we decline to

determine for the first time on appeal, whether any individual customer has

actually installed the Qwest software, downloaded records, and analyzed them as

required by the claims."  631 F.3d at 1286.  The Court also did not decide "whether

the accused products satisfy the 'as specified by the user' limitations for the first

time on appeal."  *Id.*  The Court noted that the district "court's claim constructions

are undisputed," and reversed the district court's grant of summary judgment of no

anticipation with respect to the TRACE/COBRA system.  631 F.3d at 1288, 1291.

On October 15, 2012, the district court filed an Order that, *inter alia*, denied

Plaintiff Centillion's and CTI Group (Holding) Inc.'s Motion for Partial Summary

Judgment of Infringement, and granted Qwest's Motion for Summary Judgment of

---

[3] Centillion erroneously asserts that the Court's ruling in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012), petition for cert. filed, 81 U.S.L.W. 3438 (U.S. Feb. 1, 2013) (No. 12-960), "related to Qwest's liability for active inducement of infringement due to its customer's direct infringement."  *See* Centillion's Appeal Brief, filed February 27, 2013, at 10, n.7. The *Akamai* decision, however, involved induced infringement of method claims. 692 F.3d at 1306.  The case at bar involves only system claims.  (A69-70,A71.)

Non-Infringement, finding that the accused systems did not directly infringe under the district court's claim construction and that therefore there could be no indirect infringement. (A5031,A5052-54.)

On October 30, 2012, the district court filed an Amended Entry of Judgment, which dismissed Centillion's claims with prejudice, dismissed Qwest's affirmative defenses and its declaratory judgment claim without prejudice, and awarded Qwest its costs in the amount of $251,245.92. (A5065-66.) On November 20, 2012, the district court denied Centillion's Motion to Reconsider the award of costs. (A5127-28.)

## IV. STATEMENT OF THE FACTS

### A. The Patent in Suit

The '270 Patent sets forth a very particularized system that emphasizes the preprocessing that must be performed on billing information in order to put that information into an optimal format for use on a personal computer. Under the patent, such preprocessing must take place before the information is transferred to the subscriber's personal computer. At the time of the purported invention in the late 1980s, personal computers had very limited processing and memory capabilities, requiring extensive preprocessing of data. Thus, the '270 Patent imposed specific requirements to be performed on the "back-end" of its extended system, by the service provider's computer. Further, to overcome an examiner's

6

objection that the proposed system was nonetheless obvious, a requirement that the customer specify the character of the report it would receive on its PC was added.

Figure 1 (the cover Figure of the patent and as shown below) is "an overview of the data flow in a telephone billing system according to the present invention." (A1,A56,5:28-30.) A "'processor' company 13 . . . performs a mainframe computer preprocessing step 14 . . . and reorganizes both raw and analyzed billing data into an <u>optimal format</u> 18 <u>for storage, manipulation, and display on commonly available personal computers</u> (referred to herein as "PC's"). The processor 13 then performs a PC processing step 20 which writes this information onto one or more diskettes 22 which are compatible with the subscriber's personal computer, and distributes these diskettes to the subscribers 24." (A58,10:10-31 (emphasis added); *see also* A55,3:57-65,4:28-49.)



Contrary to Centillion's assertion, C.Br.[4],16-17, the language requiring a system that "reorganizes . . . billing data into an optimal format for storage, manipulation, and display on commonly available personal computers" in the specification refers to more than merely converting billing data into a "PC – compatible" format. The Summary of the Invention provides:

> Another aspect of the invention involves . . . rearranging this [billing] information in such a manner that it is <u>optimally pre-processed</u> and reformatted into a form appropriate <u>for efficient and rapid use in subscribers' personal computers.</u>

---

[4] Centillion's Appeal Brief, filed February 27, 2013, hereinafter referred to as "C.Br."

A55,3:57-63.

> Extensive processing is required to put the information received from
> a carrier into an optimal form for use on a personal computer. . . . The
> first stage reformats data received from the carrier . . . and organizes
> the data into a table format suitable for loading into the particular
> database system used to manage this data on the subscriber's personal
> computer.

*Id.* at 4:28-39.

It is therefore apparent that the billing information must be preprocessed into a database table format in the first stage, or back-end, of the system.

As shown in representative claim 1,[5] the claims at issue require, *inter alia*, a "data processing means" that generates and organizes the preprocessed summary reports "into a format for storage, manipulation, and display on a personal computer," and a "means for transferring" the summary reports from the "data processing means" to the "personal computer data processing means".

---

[5] Independent Claim 8 has a similar structure. Claims 10 and 46 depend on Claim 8.

The invention claimed is:

1. A system for presenting information concerning the actual cost of a service provided to a user by a service provider, said system comprising:

storage means for storing individual transaction records prepared by said service provider, said transaction records relating to individual service transactions for one or more service customers including said user, and the exact charges actually billed to said user by said service provider for each said service transaction;

data processing means comprising respective computation hardware means and respective software programming means for directing the activities of said computation hardware means;

means for transferring at least a part of said individual transaction records from said storage means to said data processing means;

said data processing means generating preprocessed summary reports as specified by the user from said individual transaction records transferred from said storage means and organizing said summary reports into a format for storage, manipulation and display on a personal computer data processing means;

means for transferring said individual transaction records including said summary reports from said data processing means to said personal computer data processing means; and

said personal computer data processing means being adapted to perform additional processing on said

individual transaction records which have been at least in part preprocessed by said data processing means utilizing said summary reports for expedited retrieval of data, to present a subset of said selected records including said exact charges actually billed to said user.

In its claim construction order, the district court found that the term "data processing means" "is a means-plus-function term that must be construed in accordance with § 112, ¶ 6. The data processing means performs the functions of 1) generating preprocessed summary reports and 2) organizing said summary

10

reports into a format for storage manipulation and display on a personal computer data processing means.  The structure that corresponds to these functions is a computer that is programmed to segregate data by customer and record type, to edit and accumulate data to produce reports, to create database tables and additional records for storage, and to convert data into a PC-compatible format and its equivalents."  (A441 (emphasis added).)

Thus, Centillion's assertion, C.Br.,18, that the language "format for storage, manipulation and display on a personal computer" means the file format is "preferably" – rather than *necessarily* – a table format suitable for loading into a database system, is at odds with the district court's construction which expressly refers to structure (an algorithm)1[6] "to create database tables."  (A441.)

Centillion also incorrectly asserts, C.Br.,18, that "nothing in the specification suggests that the reorganized data–prior to actually being loaded into the database of a PC–must be provided with formatting information beyond their minimum semantic elements."  This ignores the specification's provisions, which are reflected in the claim language and the district court's claim construction, that the reorganized data be in database tables *prior to* being transferred to the PC. (A55,3:57-65,4:28-59;A69,31:39-32:6;A441.)

---

[6] In view of *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, 1333, 1338  (Fed. Cir. Mar. 28, 2008) the structure for such a software implemented means-plus-function limitation must be an algorithm.

Claim 1 also recites "preprocessed summary reports as specified by the user." The "as specified by the user" limitation of claim 1 finds no support in the specification, but was nonetheless relied on as a novel feature to overcome an examiner's obviousness rejection. (A4093,A4220-4230.) This term was construed by the district court during the *Markman* process as an active limitation:

> [T]he phrase requires that the service customer select or make specific, the character of the preprocessed summary reports. For this reason the Court concludes the term "as specified by the user" means "the service customer selects or makes specific, the character of."

(A444.) This term was not included as part of the recited function of the data processing "means" but instead was construed as a separate limitation.[7]

(A441-44,A456.)

## B.    The LOGIC and eBill Companion Systems

LOGIC and its successor eBill Companion ("eBC") are products that Qwest[8] makes available to customers, typically business customers. (A5264-66,295:11-16;A586,A597,¶23.) Some Qwest customers have signed up for such products. (A841,A862,422:21-423:12.) Customers who sign up for such products have made

---

[7] The district court also separately construed the term "summary reports" as "a collection of analyzed and/or reorganized data." (A452.)

[8] While Qwest is collectively used throughout, QCC is the entity that historically provides eBC, LOGIC and Insite. (A465, A479,¶¶10-11.) Centillion alleges that the last is a rebranded version of the LOGIC and eBC products that Qwest provides to Bell South for its customers and has provided no separate infringement analysis. (A479,¶11.)

available to them electronic billing information on a monthly basis. (A596,¶¶8-9.) In particular, Qwest generates and stores billing information, transfers certain of that information for further processing in its data processing systems, and then makes that information available by CD and/or on-line download to customers who have signed up for LOGIC or eBC. (*Id*;A591,41:4-14.) The information provided is in a standard form determined by Qwest. (A854,139:4-140:16;A817,A819,¶4.)

Qwest also makes available client application software that may be loaded on a PC and can be used with eBC, LOGIC and Insite billing information. Some, but certainly not all customers and usually not large customers, who have signed up for eBC, LOGIC and Insite, also take the application software from Qwest. (A4412,A4414,¶4;A582,A584,¶3;A1379,A1889;A596,¶10;A600,A606,154:24-155:19.) Qwest does not require that customers take the application software, load the application software if taken, or use this application software in any way. (A584,¶3;A1889;A596,¶10;A606,154:24-155:19.)


(A3504,A3508,¶15.)

### 1. eBC .TXT files and .FMT files

(A4415,¶6;A4231,A4308-A4309.)

(A4415,¶6.)

15,¶6;A4308-09.)

Neither a .TXT file nor a .FMT file is a database table.[10] (A4264,A4272-73,38:4-9,41:8-42:15;A4093,A4188.) A database table is a container for data with columns and integrated schema. (A4288,A4297,255:1-6,16-19.)

[11] (A4272-73,41:21-42:2.)

(*Id* at 41:8-42:5.)

(*Id* at 40:18-41:7;A4188;A4297,254:20-255:19.)

---

[9] The "call_detail.TXT" file does not contain a "collection of analyzed and/or reorganized billing records" as described by the '270 Patent. (A4188.)

[10] Centillion has only identified the call_detail.TXT and call_detail.FMT file pair as being the claimed summary reports. (A823,A906-07,57:24-58:19.)

[11] (A4273,42:6-13.)

14

(A4272,40:24-41:7,A4276,56:13-57:18.)

(A4262,531:19-23;A4187-88;A4273-

74,43:23-47:19.)

## 2. On Demand

Whether they have installed the Qwest client application software or not,

Qwest eBC customers registered to use the Qwest portal, can make an "On

Demand" request for billing information by web download only.

(A4488,A4551;A4417-18,¶¶10,14,16;A4474,A4476,¶¶5,8,10 and 26;A3510-

11,¶¶22,24) Qwest customers can only use the eBC On Demand feature to get a

copy of data from a single previous billing cycle. (A596,¶8;A857-58,221:11-

222:2,222:21-223:17;A4294,209:9-21;A4188-89;A4418,¶¶14,15;A3510-

11,¶¶22,23.) The On Demand feature simply allows a Qwest customer to receive

eBC data files for a given fixed billing cycle and does not let the customer specify

any arbitrary date range or alter the character of the data files received. (A4249-

50,221:11-222:2;A4294,209:9-21;A4188-89;A4417-19,¶¶10, 14, 15;

A4554;A3511,¶23.) The On Demand feature is independent of the use of the eBC

client application software (A4551;A4416-18,¶¶9-11,14,16;A4474,A4476,¶¶5,10

and 26;A3510-11,¶¶22,24), and Centillion has presented no evidence of any single customer using both On Demand and the eBC client application software, but instead only provides alleged circumstantial evidence of the use of the eBC download portal independent of an installed eBC client application. (A4281,101:15-21;A4758,A4766 at CORRECTIONS TO CENTILLION'S FACTUAL MISCHARACTERIZATIONS No. 13;A4776-77.)

### 3. Project Account Codes

The Project Account Code ("PAC") field, is always present in the Call Detail Record ("CDR") information and data files regardless of whether a customer chooses to use this Qwest general telecommunications feature. It is independent of LOGIC and eBC. How the PAC feature is implemented, and whether a customer must enter a code prior to making a call relies on customer internal setup not involving LOGIC or eBC. Qwest provides information and the fields contained in the CDR. The fields provided by Qwest do not change depending on whether a customer is using a certain feature, such as PAC. Any number entered by the customer, such as the phone number or PAC, will flow through the switch and be present in a given field in the CDR, but the field will always be present whether the customer enters a value or not. (A4231,A4246-48;A4278-79,85:17-87:6;A4188;A4292-94,201:11-206:10;A4480 (showing "PAC" field is always present in data file).) Customers are not required to, nor

16

necessarily do, use any eBC data containing PAC information provided by Qwest for billing analysis.  (A4282-83,156:23-158:2,160:25-161:23;A4285,212:3-15; A4414,¶4;A4418,¶¶12, 13.)

### 4.    eBC Data File Updates

Qwest makes occasional updates to the eBC client application and data files sent to customers.  Customers may make suggestions that are reviewed along with the internal Qwest development team updates for possible inclusion into updates. (A4242,130:20-133:11;A4244,139:4-19;A4188;A4414-15,¶5.)  Contrary to Centillion's assertion, C.Br.,54-55,

(A4242 at 130:20-133:11; A4244 at 139:4-19; A4188; A4414-A4415 at ¶5.)

A4242,132:16-18;A4244,139:4-19;A4414-15,¶5; A3504,A3512,¶28.)

(A906-07,57:24-58:19.);A4414-16,¶¶5-7.)  Various

configurations and combinations of the above systems are possible.  Some using

the Qwest client software, some not, some PAC, updated eBC data files and On

Demand, but some not - all at the customer's choice and not dictated by Qwest.

But importantly here, it is only those systems used by a customer that have the

Qwest client software installed on such customer's personal computer and have

used PAC, in the case of LOGIC, and PAC, "customization" or On Demand in the

case of eBC, that are accused of infringement in this lawsuit.[12]

## C.    Centillion's Motion for Summary Judgment

Centillion has twice moved unsuccessfully for partial summary judgment of

infringement with respect to eBC.  The first time in 2009, and then again in 2011.

In both instances, Centillion relied upon the district court's 2008 claim

construction and asserted that each and every limitation of the claims as construed

was found in eBC; at no time did Centillion suggest that the claim construction

needed to be changed in any way.  Such assertions included that the alleged data

processing means of the eBC system generates preprocessed summary reports as

specified by the user.  (A1379,A1406.)  In support of that assertion, Centillion

---

[12] While Centillion belatedly attempts to avoid its prior concession found to
apply by both this Court and the district court that installation of the Qwest client
software is required for a claim of infringement, this issue should not be re-opened
here.

addressed the very elements ultimately considered by the district court in the

second round of motions, and argued in its own brief (albeit on an incorrect

understanding of the facts as had been admitted by its own expert):

### i. The Data Processing Means

> . . . the eBCBO itself is a computer programmed to perform all four requirements identified in the Court's construction of the data processing means structure in order to perform the construed functions: . . .

eBCBO is programmed to create database tables . . :


. .


> The call_detail.txt file, together with its corresponding call detail.fmt file is a "database table" containing rated call detail records. . . . Finally, the contents of the data files are imported and stored into either the MSDE or SQL Server of the eBC client application. . . . Thus, these "summary reports" . . . are organized into a "format for storage, manipulation and display on a personal computer."

(A1407-09 (emphasis added).)

### D.  Qwest's Opposition to Centillion's Motion for Summary Judgment

Qwest's opposition to Centillion's motion for summary judgment explained

that the alleged summary reports were not in the form of database tables, and

therefore were not in the proper format to satisfy the requirements of the data

processing means.  In particular, Qwest explained that

19

(A4074,A4078;

A4277,60:22-61:13.)

(A4078;A4064, Material Fact 11.)

(A4063,

Material Fact 5.)  Thus, Centillion was on notice that the .TXT file was not in the

proper format to satisfy the requirements of the data processing means.

### E.    The District Court's Summary Judgment Ruling

The district court carefully considered Qwest's summary judgment motion

---

[13] The district court concluded that the eBC Back Office and LATIS, or a combination thereof, generates preprocessed summary reports as required by the claims.  (See A5051.)  LATIS, however, cannot be the "data processing means" because it does not receive records transferred from the "storage means" as required by the claims.  (See A69,31:53-55,32:45-47.)  Centillion has only identified the BDS data store as the accused "storage means."  (A1403; see also A4268-69,15:24-25,18:19-19:6.)
(A4270-71,25:22-26:4.)  Further, the aggregation of disparate systems -- eBC Back Office and LATIS -- cannot satisfy the elements of the claimed "data processing means."
(A4186-87;A4268,14:25-15:25;A4419,¶17;A771
).)

asserting that the "as specified by the user" limitation was not present in the accused products, and Centillion's summary judgment motion and Qwest's opposition, in determining that summary judgment was required because two limitations of the claims were missing in the accused products.  In reaching that conclusion, the district court initially determined that Centillion had conceded during its first appeal that its infringement theory required the customer to install Qwest's client software.  (A5043.)  Next, the district court determined that PAC codes did not satisfy the "as specified by the user" limitation (A5047), and since Centillion's only basis for meeting this limitation in LOGIC was premised on PAC codes, that  summary judgment of non-infringement as to LOGIC was required. (A5048.)

The district court then addressed the three theories that Centillion raised for meeting the "as specified by the user" limitation for eBC.  It found that this limitation was not met with PAC for the same reasons as LOGIC.  It then looked at "customization" of eBC data files provided by Qwest and found that because any "customized" versions of eBC data files would not work with the client application software provided by Qwest, and because Centillion had conceded during the first appeal that installation of the Qwest client software was necessary for infringement, that no infringement could be found for any customers that received "customized" data files. (A5048.)  Finally, the district court looked at the On

21

Demand feature that is hypothetically possible to use with an installed Qwest client application and found that this met the "as specified by the user" limitation. (A5049.) The district court did not find any specific direct infringer, but stated that disputes of fact remained on whether there were any On Demand users that had in fact installed the eBC client application software.[14] (*Id.*)

The district court then turned to the "data processing means" limitation, and found that this limitation was not met in the eBC system. (A5052.) The district court specifically found that the .TXT file (the alleged summary report) was not properly formatted and focused on the "data processing means" requirement that the summary report be a database table:

> Qwest contends that eBC does not have a "<u>data processing means</u>" as that term was construed in the Markman Order. . . .  the Court concludes that eBC Back Office, LATIS, or a combination thereof, does not "organiz[e] said summary reports into a format for storage manipulation and display on a personal computer data processing means." . . . <u>neither of those systems organize the summary reports into a format for display on a personal computer. Instead, the customer must be provided with a .FMT file and schema within the eBC client application to interact with the .TXT file and allow display of the summary reports</u> on a personal computer. . . .

(A5050-52) (emphasis added) (internal citations omitted).)  I.e., the alleged "data

---

[14] The district court's approach is consistent with this Court's recognition that where only a hypothetical and particular configuration of a product directly infringes, a defendant's liability for indirect infringement must relate to the identified instances of direct infringement and damages must similarly be restricted.  (*Dynacore Holdings Corp. v. U.S. Philips Corp,* 363 F.3d 1263, 1274 (Fed. Cir. 2004).

processing means" fails to create database tables, as required under the court's

claim construction for this element.

(*Id*; A4262,531:19-23;A4187-88;A4273-

74,43:23-47:19.)

Centillion is incorrect in asserting that

[a]ccording to the district court, not only do the claims require that the "data processing means" organize the data into a format that is "suitable for loading" into a database system on a PC . . . but the data must actually be loaded into such a database system, requiring additional software structures and processing steps that "allow [for] display] of the data on a PC monitor.

(C.Br.,25-26 (emphasis added), citing A5052.)  The district court's ruling simply

reflects the fact that that the .TXT file data is not placed into a database table

format by the alleged data processing means as required by the claim, and is

instead placed into a database table format on the customers PC, downstream of

the alleged data processing means.  (*See* A5050-52;A441;A69,31:39-32:6

(requiring properly formatted summary reports to be transferred from data

processing means to personal computer).)

The court subsequently ordered typical costs as appropriate under Seventh

Circuit law. (A5065-66.)

23

## V.    SUMMARY OF THE ARGUMENT

The accused systems considered by the district court in its Order involve only a hypothetical subset of the LOGIC and eBC customers' configurations of possible systems.  During the first appeal, this Court determined that Qwest could not be a direct infringer of the system claims at issue, nor vicariously liable for a customer's direct infringement.  The Court declined to address for the first time on appeal whether any customers actually directly infringed, but noted that direct infringement would require a complete system meeting all the claim limitations and specifically required that such customers install the Qwest client application software, download records and analyze them to meet the claims.  631 F.3d at 1285-86.  Further, the Court noted, but did not decide, the requirement that the summary reports must meet the "as specified by the user" limitation of the claims. *Id.*

Confronted with these layers of claim limitations, Centillion argued that the "as specified by the user" limitation could be met by PAC for LOGIC and eBC, and that "Customization" or On Demand could also meet this limitation for eBC. Centillion also argued for a new claim construction of "as specified by the user" to avoid the active language of that claim element.  The district court properly reiterated that "as specified by the user" is an active limitation. (A5049-50; *see also* A443.)  This is in consonance with the Court's Decision on the first appeal:

24

> The court's claim constructions are undisputed. It construed "summary reports" to mean "a collection of analyzed and/or reorganized data." It construed "as specified by the user" to mean "customer selects, or makes specific, the character of." This means that, to anticipate, the COBRA system must generate "a collection of analyzed and/or reorganized data that a customer selects, or makes specific, the character of."

631 F.3d 1279, 1288 (emphasis added). This is now the law of the case.

*Centillion Data Sys., LLC, v. Qwest Commuc'ns Int'l., Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1324 (Fed. Cir. 1987) ("Prior findings and the claim construction based thereon are the law of the case. They are not available for redetermination.")

The district court next properly held that PAC cannot meet the "as specified by the user" limitation. A Qwest customer, irrespective of whether it ever signs up for Logic or eBC, or whether it ever receives any type of computerized billing report at all, can request that it have the PAC feature in its telecommunications service. (A4418,¶12.) This request for PAC is completely independent of any reports received and does not in any way change the format, type of fields included, or any other character of any billing report a customer may receive. (A4246-48,185:21-190:10;A4278-79,85:17-87:6;A4188;A4292-94,201:11-206:10;A4480 (showing "PAC" field always present in data file); A821,¶16.) The inclusion of PAC in a billing record is no different from the inclusion of a phone number dialed in the billing record. Neither the patent nor the district court's claim

25

construction contemplates the entering on the phone of a PAC or phone number as amounting to the "as specified by the user" limitation. In fact, the '270 inventors specifically disclaimed PAC as a novel feature during the prosecution. (A823,A1005-07,A1009-10,A1014,A1016,A1040, A1047, A1061, A1064, A1071,A1086,A1091-96,A1098,A1101,A1103,A1105,A1109,A1112,A1114-15,A1121,A1128,A1136,A1139-40; *see also* A4216, examiner's statement that "project accounting code" was well known and could be found on a telephone bill or through the telephone company by request.)

The district court also properly determined that because "customized" reports could not be used with the Qwest client application software and installation of such software was required for direct infringement, that "customization" could not meet this claim limitation.


(A4244,139:4-19;A4188;A4414-15,¶5; A3682,73:1-15.) Qwest makes occasional updates to the eBC client application and data files sent to customers based on input from customers and internal team suggestions.

Importantly, updates involving new fields in the eBC data files are incompatible with the eBC client application. Under Centillion's own description of the requirements for infringement, customers who do not install the client

26

application software on their PCs would not be able to infringe the asserted claims. (A4314.) Both this Court and the district court understood Centillion's statement in its first appellate brief to mean exactly what it says; the claim limitation "adapted to perform additional processing" can only be met if the installation of the eBill Companion client application, the downloading of call data, and its importation into the eBC client application are completed according to Qwest's step-by-step directions. (*Id.*,A5043-44;631 F.3d 1279, 1286 n. 2 ("Centillion concedes that in order to infringe, the customer must install Qwest's client software. Appellant's Br.,31.").)[15] Permitting a litigant to recant prior statements to the Court where later inconvenient is, at a minimum, a risk to judicial economy.

The district court erroneously found that On Demand satisfies the "as specified by the user" limitation. The district court's claim construction specifically provides that "the phrase 'as specified by the user' requires that the service customer select, or make specific, the character of the preprocessed summary reports." (A444.) The data fields, format, type of data records, and data date period that make up the character of the billing file cannot be altered based on the On Demand request by a user. (A4249-50,221:11-222:2;A4294,209:9-21;

---

[15] Appellants February 19, 2010 Opening Brief repeatedly made installation of Qwest client software a requirement. (*See* pages 11-12, 14 and 31, the latter two relied upon by the district court and this court in its decisions. (A4311-12,A4314-15, Brief of Appellant Centillion Data Systems, LLC, February 19, 2010.)

A4188-89;A4417-19,¶¶10,14,15;A4554;A3511,¶¶23.)  On Demand merely allows a customer to submit a request to receive a copy of the same billing information covering the same fixed period of time as a bill that was previously made available by request for download via the Qwest Portal website. (A596,¶8;A857-58,221:11-222:2,222:21-223:17;A4294,209:9-21;A4188-89;A4418,¶¶14,15;A3510-11,¶¶22,23.)  Such a selection does not affect "select[ing] . . . the character of" the reports.

Even assuming On Demand satisfies the "as specified by the user" limitation, however, there is no evidence of any customer that used the On Demand feature and had the Qwest eBC client application installed on the customer's computer.  (A4281,101:15-21;A4758,A4766 at CORRECTIONS TO CENTILLION'S FACTUAL MISCHARACTERIZATIONS No. 13; A4776-77.)  Use of On Demand does not require installation of the Qwest client software.  (A4551;A4416-18,¶¶9-11,14,16;A4474,A4476,¶¶5,10 and 26;A3510-11,¶¶22,24)

The district court properly determined that in any event, the accused eBC product does not meet the "data processing means" limitation.  Initially, Centillion was on notice that summary judgment was under active consideration when it moved for partial summary judgment of infringement.  Centillion in its motion argued that the district court's construction of the "data processing means" included the requirement of being "programmed to create database tables," that

28

"the call_detail.txt file together with its corresponding call_detail.fmt file is a "database table," and thus that these "summary reports" are organized into a "format for storage, manipulation and display on a personal computer." (A1407-09.) Qwest's opposition to Centillion's motion for summary judgment highlighted that the .TXT file was not in a proper format to satisfy the "data processing means" requirements. In particular, Qwest explained that neither the call_detail.txt file nor the call_detail.fmt file, individually or in combination, is a database table. (A4078;A4064, Qwest's Material Fact 11.) Thus, Centillion was clearly on notice that the .TXT file was not in the proper format to satisfy the requirements of the data processing means.

Centillion now argues that the language "format for storage, manipulation, and display" merely requires that the summary reports be organized into a form that is PC-compatible. This argument ignores the district court's claim construction, pursuant to which the language "format for storage, manipulation, and display" includes the requirement that the summary reports be database tables. (A456.) Centillion did not appeal the district court's claim constructions. As the Court in its Decision on the first appeal noted, "[t]he court's claim constructions are undisputed." 631 F.3d 1279, 1288. Further, Centillion relied upon the very claim construction it now attacks in bringing its summary judgment motion. Thus for both reasons, Centillion waived any objections to the district court's

constructions.

Centillion's attempt to avoid the database table requirement is understandable. *Centillion's expert admitted that "the .txt file is technically data for a database table, rather than a table per se."* (A4753,¶7 (emphasis added).) Thus, Centillion's expert admits that a .TXT file is not a database table.

Centillion's expert acknowledged that an eBC customer must use the eBC client application to create a database table on its PC *before* the data in the .TXT file is introduced. (A4276,57:9-19.) The claims cannot, however, be satisfied by having the database tables created on the user's PC since that would eliminate the second "means for transferring" the summary reports from the "data processing means" (at a system back-end) to the "personal computer data processing means" (at the user front end). (A69.)

The district court also erroneously found that the .TXT file satisfies the "summary report" limitation. In arriving at its conclusion, the district court explained: "The eBC Back Office organizes the billing information by customer and inserts that information into various .TXT files …" (A5051.) This is inconsistent with the district court's claim construction of "summary report", which requires "a collection of analyzed and/or reorganized data." (A452.)

Finally, the district court did not abuse its discretion in awarding Qwest's costs which are recoverable pursuant to 28 U.S.C. §. 1920, as necessary,

reasonable, and properly substantiated.

## VI.  ARGUMENT

### A.  The District Court Properly Granted Summary Judgment of Non-Infringement by The LOGIC System

#### 1.  The district court properly found that "as specified by the user" is an active limitation

The district court's Order states:

> Examining the language of the claims, the Court concludes that <u>mere capacity is insufficient</u>.  The fifth element of Claim 1 speaks of a "data processing means generating . . . reports <u>as specified by the user</u>," language that <u>speaks of the data processing means taking some sort of action to bring the reports into existence</u>.

(A5049 (emphasis added).)  This is in consonance with the Federal Circuit's prior

Judgment in this case.  There, the Federal Circuit, in the context of discussing the

prior art, acknowledged:

> <u>The court's claim constructions are undisputed</u> . . . It construed "<u>as specified by the user</u>" to mean "customer selects, or makes specific, the character of." This means that, to anticipate, the COBRA system <u>must generate</u> "<u>a collection of analyzed and/or reorganized data that a customer selects, or makes specific, the character of</u>."

631 F.3d 1279, 1288 (emphasis added).  This is now the law of the case.

*Centillion Data Sys., LLC, v. Qwest Commuc'ns Int'l,, Inc.*, 631 F.3d 1279, 1288

(Fed. Cir. 2011); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320,

1324 (Fed. Cir. 1987) ("Prior findings and the claim construction based thereon are

the law of the case.")

### 2. The district court properly found that PAC cannot meet the "as specified by the user" limitation

Centillion argues, C.Br,45, "that if a service customer, ancillary to the act of subscribing, contacts its service representative to specify that it wishes its reports to include PAC data, any reports so generated must, by any definition, be 'specified by the user.'" Centillion is incorrect. A Qwest customer does not contact Qwest and specify that it wishes its reports to include PAC data. A Qwest customer, irrespective of whether they are ever signed up for Logic or eBC, or whether they ever receive any type of billing report, can request that they have the PAC feature in their telecommunications service. (A4418,¶12.) This request for PAC is completely independent of any reports received and does not in any way change the format, type of fields included, or any other character of any billing report a customer may receive. A4246-48,185:21-190:10;A4278-79,85:17-87:6;A4188;A4292-94,201:11-206:10;A4480 (showing "PAC" field always present in data file);A821,¶16.) The PAC field is always present in the billing data and either contains a NULL value or a value entered into the phone before or after the phone number is entered by the customer when placing a phone call. (*Id.*)

Centillion goes on to argue based on the district court's invalidity analysis that "if the selection of a particular report 'type' from among three or four different types *(e.g.,* TOLL, Local, equipment, etc.) is 'arguably 'select[ing] or mak[ing] specific, the character of' a report'–despite having *no* actual input into the content

32

of the report itself–then certainly specifying the inclusion of PAC data in a report–
which *does* materially affect the content of the record–should also at least arguably
satisfy this claim limitation for purposes of infringement." (C.Br.,46 (emphasis in
original).)  Again, Centillion's argument is disconnected from the facts of the case.
In the prior art TRACE/COBRA system cited by the district court, customers had a
choice of specifying which of four different report types they wished to receive.
Each of these report types contained a different format, different fields of data,
and/or different record types.  (A1254-55.) When a customer of TRACE/COBRA
specified which report it wanted to receive it specified the character of the report.
(A1257.)  In contrast, with regard to the PAC feature of telecommunications
service, the request to utilize PAC in no way determines what reports will be
received by the customer, or the character of any reports or eBC/Logic data files
the customer elects to independently receive.

Centillion attempts to rely upon a dictionary definition to try and make its
argument that PAC somehow affects the "character" of the eBC/Logic data files
made available to the applicable Qwest customers. (See C.Br.,47, citing *Webster's
Third New Int'l Dictionary* 376 (1993) for the term "character" as "any feature
used to separate ... distinguishable things … into categories.") This dictionary
definition further supports Qwest's position as it specifically states that
distinguishable things are separated into categories.  Unlike the TRACE/COBRA

33

prior art, in which each report that can be specified contains different collections of data separated into different categories from the other reports, the eBC and LOGIC data files always contain a category (data field) for PAC regardless of whether the customer is signed up for the PAC telecommunications feature or not. (A4246-48,185:21-190:10;A4278-79,85:17-87:6;A4188;A4292-94,201:11-206:10;A4480 (showing "PAC" field always present in data file);A821,¶16.)

Centillion also mistakenly asserts that whether a client has chosen to utilize PAC or not "materially affect[s] the content of the record." (C.Br.,46.) The inclusion of PAC in a billing record is no different from the inclusion of a phone number dialed in the billing record. Any PAC entered by a customer during a call passes through the telecommunications switch in the same manner as a telephone number that has been entered by the customer. Both values appear in a CDR before any data is even stored by a Qwest system. (A4188.)

Under Centillion's theory, a customer entering a telephone number would then also meet the element of "as specified by the user." This is unsupportable; merely changing the data – of the PAC or the telephone number – will not affect the character of the billing record or any subsequent reports or data files that may be received by the customer. Neither the patent, nor the district court's claim construction contemplates the entering on the phone of a PAC or phone number as amounting to the "as specified by the user" limitation. Centillion's misreading of

the Court's construction would improperly broaden the scope of a patent to encompass any reports that include telephone numbers. It is the "preprocessed summary reports" that must be "as specified by the user," and the preprocessed summary reports must be generated by the data processing means. (A456.) Applying the Court's construction of "as specified by the user," the service customer selects, or makes specific, the character of preprocessed summary reports *generated by the data processing means.* By arguing that the use of PACs satisfies the "as specified by the user" limitation, Centillion is untying the user's selection from the data processing means and relying on an entry at the time a call is made to provide the "selection." This alleged PAC selection is happening upstream of, and prior to, any possible "storage means" or "data processing means" claim elements, and does not affect the required generation of preprocessed summary reports by the data processing means.

Further, during prosecution of the '270 patent, in an office action in which the examiner rejected all claims, the examiner noted:

> It is well known that the following can be found on a telephone bill or through the telephone company by special request: cost, usage. . . . project accounting code, summary to which project accounting code was attributed . . . Because it is so well known that the aforementioned information can be found on a telephone bill or through the telephone company, it would have been obvious to include them in a telecommunications system.

(A4216.)

35

The examiner specifically pointed out that the prior art already contained examples of sending CDR data to customers consisting of *project accounting code*. (*Id.*) (*See also* instances of software supplying CDR data and reports with project code and account codes in prior art cited on the face of the '270 patent (A823,A1005-07,A1009-10,A1014,A1016,A1040,A1047,A1061,A1064,A1071, A1086,A1091-96,A1098,A1101,A1103,A1105,A1109,A1112,A1114-15,A1121,A1128,A1136,A1139-40.) This rejection by the examiner immediately preceded the applicants' amendment adding the "as specified by the user" element and clarification that it was "preprocessed data in the sense of providing summary reports as specified by the user" that was the patentable feature of the patent application. (A4227); (*See* A4322 attached to the Patentee's July 6, 1993 Amendment (A4327-37) where Mr. Briere specifically distinguished the '270 patent from the prior art, which just provided raw CDRs, because the pending patented system "indexes and preprocesses the raw data that comprises the telephone CDR and prepares summary reports according to both standardized and individualized formats.") It is clear that simply providing the non-novel PAC as part of the CDR does not meet the patentable feature and required claim element of generating preprocessed summary reports as specified by the user.

## B. The District Court Properly Granted Summary Judgment of Non-Infringement by the eBC System.

### 1. The district court properly found that infringement requires Qwest's client application software be installed on a user's PC.

"Centillion concedes that in order to infringe, the customer must install Qwest's client software. Appellant's Br.,31." 631 F.3d 1279, 1286 n. 2. Under Centillion's own description of the requirements for infringement, customers who do not install the client application software on their PCs would *not* be able to infringe the asserted claims. (A4314.) Centillion now tries to back away from this statement to save its argument that customizations may satisfy the "as specified by the user" limitation. Both this Court and the district court understood Centillion's statement to mean exactly what it says, that the claim limitation "adapted to perform additional processing" is met "*only* if the installation of the eBill Companion client application, the downloading of call data, and its importation into the eBC client application are completed according to Qwest's step-by-step directions." (*Id.* (emphasis added.)

Centillion's assertion, C.Br. at 52, that "while [it] acknowledged that a client application had to be installed on the PC in order to adapt it to perform 'additional processing' of the records, it never 'conceded' that it had to be one of *Qwest's* client applications" is belied by Centillion's actions. Centillion, in its first appeal to the Court, repeatedly stated that installation of Qwest client application software

37

was a requirement.

> The Accused Systems comprise two parts: [(1) Qwest's Billing
> Systems, including LATIS, eBill Companion Back Office], and
> various related "back office" systems, which Qwest uses to prepare
> and deliver customer billing data, and (2) the Logic and eBill
> Companion client applications, provided to customers to run on their
> personal computers and used to perform billing analysis on the billing
> data received from Qwest.

(2010-02-19 Centillion Opening Appeal Brief at 11-12.)

> Only if the installation of the eBill Companion client application, the
> downloading of call data, and its importation into the eBC client
> application are completed according to Qwest's step-by-step directions
> are the customers' personal computers "adapted to perform additional
> processing" as set forth in the claims.

(A4314.)

> Qwest's customers, of course independently determine whether they
> want to use the Accused Systems; however, once they install the
> software and accept the terms of Qwest's license, their personal
> computers are "adapted" to perform "additional processing" as
> claimed. … Indeed, the eBill Companion client application software
> provided by Qwest is the linchpin that functionally connects Qwest
> back-office servers with its customers' personal computers.

(A4315.)

During the course of this case, now running for over nine years, Centillion at

no time attempted to conduct discovery on any supposed third party client

applications, or any supposed client applications built by customers.  Instead,

Centillion's focus has always been on the eBC, Insite, and Logic client

applications.  In this context, Centillion's admission of the necessity of the eBC

client application is understandable.

Both this Court and the district court had the benefit of reading Centillion's multiple statements in context and correctly interpreted Centillion's intention as an admission requiring installation of the Qwest client application software and data imported in order to satisfy the "additional processing" requirement of the asserted claims. (A5043;A1360,fn. 2; *see also* fn.11 herein.) *United States v. Cunningham*, 405 F.3d 497, 503-504 (7th Cir. Ind. 2005) (stating that a concession made in an appellate brief is binding on the party); *see Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court."); *see also United States v. One Heckler-Koch Rifle*, 629 F.2d 1250, 1253 (7th Cir. 1980); *Soo Line R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997) (noting that judicial efficiency demands that a party not be allowed to controvert what it has already told a court.)

### 2. The district court properly found that "customizations" cannot meet the "as specified by the user" limitation.

The district court's Order states that "Qwest's customization of eBC data files for particular customers does not satisfy the 'as specified by the user' limitation." (A5048.) The district court only focused on eBC because there is no evidence of such alleged customizations requested or performed for any LOGIC customers. Centillion erroneously states that the record leaves no doubt that Qwest has customized the information in the eBC .txt files for certain customers.

39

(C.Br.,54.)   Centillion's discussion of                   files confuses "customization"

with the standard industry practice of periodically updating data files.

(A4244,139:4-19;A4188;A4414-15,¶5; A3682,73:1-15;) Qwest makes occasional

updates to the eBC client application and data files sent to all customers.

Customers may make suggestions that are reviewed along with the internal Qwest

development team updates for possible inclusion into updates. Changes suggested

by customers may or may not be incorporated in future updates. (*Id.*) It is difficult

to know if a change is being made specifically due to a customer request, or the

change was already contemplated by various other people such as Qwest sales

personnel. (*Id.*)

Contrary to Centillion's assertion, (C.Br.,54-55),

(A4242,132:16-18;A4414-15,¶5.)

(A4415,¶6.)

40

(A4242,132:16-18;A4414-15,¶5.)

*Any* new fields released in updated eBC data files cannot be used, and are

incompatible with the eBC client application. (A4415,¶6.) Any customer that has

requested changes to the eBC data files and had those changes implemented would

not be able to use the eBC client application to analyze the updated data files. (*Id.*)

As discussed earlier, under Centillion's own description of the requirements for

infringement, customers who do not install the client application software on their

PCs would *not* be able to infringe the asserted claims. (A4314.)

### 3. The district court erroneously found that On Demand satisfies the "as specified by the user" limitation.

On Demand is available to eBC and InSite customers, and is available for

those customers to use irrespective of whether they have received and installed the

eBC or InSite client application software. (A596,¶8;A4488,A4551;A3510-

41

11,¶¶22,24; A4417-18,¶¶10,14;A4474,A4476,¶¶5,10 and 26.) On Demand allows a customer to submit a request to receive a copy of the same billing information covering the same fixed period of time as a bill that was previously made available. (A596,¶8;A857-58,221:11-222:2,222:21-223:17;A4294,209:9-21;A4188-89;A4418,¶¶14,15;A3510-11,¶¶22,23.) The requested billing information is already compiled and prepared on a monthly basis whether a user requests the data or not through On Demand. The On Demand request from a user simply is a request to send the billing information previously compiled and made available to the user. (*Id*.) The district court's claim construction specifically requires that "the phrase [as specified by the user] requires that the service customer select, or make specific, the character of the preprocessed summary reports." (A444.) It is not enough to simply select that a report covering the same billing information previously made available be received; instead the character of the report must be selected or made specific. The On Demand request does not select or make specific the character of the billing files requested, and therefore does not satisfy the "as specified by the user" claim limitation.

### 4. Even assuming On Demand satisfies the "as specified by the user" limitation, there is no evidence of an eBC customer using On Demand and having the Qwest client application installed.

The district court found there was an issue of material fact as to whether at least one Qwest customer used the On Demand feature. (A5048-49.) However,

there is no evidence of any customer that used the On Demand feature *and* had the

Qwest eBC client application software installed on the customer's computer. The

district court erroneously concluded that there was a genuine dispute of material

fact as to whether at least one of Qwest's customers used the On Demand feature

based on evidence presented by Centillion that:

Dkt. No. 886-9 at 3."

(A5049.) The district court misinterpreted this email as being related to use of On

Demand with the eBC client application software. Nowhere in this email, nor in

any other evidence presented by Centillion, is a Qwest customer using the On

Demand feature to obtain billing data for use with the eBill Companion client

application software. (A4281 at 101:15-21;A4758, A4766 at CORRECTIONS TO

CENTILLION'S FACTUAL MISCHARACTERIZATIONS No. 13; A4776-77.)

Because use of On Demand does not require use of the eBill Companion

application, this is not evidence, circumstantial or otherwise, that this same

customer or any other Qwest customer utilized On Demand in conjunction with the

eBC client application software. (*Id.*) (A4551;A4416-18,¶¶9-11,14,16; A4474,

A4476,¶¶5, 10 and 26;A3510-11,¶¶22,24)

Of the thirty documents cited by Centillion's expert as purporting to provide

43

evidence of Qwest customers using On Demand, none of the documents, including

the _____ email cited by the district court, demonstrate a customer that is both

using the On Demand feature and the eBC client application software.

(A2929,A2930-31,¶6; *See* A4062,¶29; A4281,101:15-21;A4758,A4766 at

CORRECTIONS TO CENTILLION'S FACTUAL MISCHARACTERIZATIONS

No. 13; A4776-77.)

> **5. The district court granted summary judgment on an issue that was raised in Centillion's own motion for summary judgment.**

Centillion's assertion that it was not properly put on notice is unfounded. A

party has proper notice that the court is considering summary judgment when it

files a motion for summary judgment.[16]  *See Goldstein v. Fid. & Guar. Ins.*

*Underwriters, Inc.*, 86 F.3d 749, 751-52 (7th Cir. 1996) (Because plaintiff filed a

motion for summary judgment "[b]oth parties, [plaintiff] in particular, were on

notice that summary judgment was being considered" and it was appropriate for

the court to grant summary judgment in favor of the defendant *sua sponte* as no

---

[16] Centillion's cited authority is inapposite as there was no formal motion for
summary judgment by the plaintiff in *R.J. Corman Derailment Services, LLC v.
Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*.  335 F.3d 643,
647 (7th Cir. 2003) (holding that the parties were not on notice where the plaintiff
requested in a footnote in its reply memorandum in support of its motion for a
preliminary injunction that its preliminary injunction motion also be considered a
motion for summary judgment in the alternative and the court *sua sponte* entered
declaratory judgment on the pleadings even though the pleadings were not yet
closed).

genuine issue of material fact existed). *See Jones v. Union Pac. R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002) ("[W]hen [plaintiff] moved for summary judgment *both* parties were on notice that summary judgment was under active consideration" and therefore the district court did not err in granting summary judgment against the plaintiff regardless of whether defendant's reply brief was considered a cross-motion for summary judgment). A district court is permitted to enter summary judgment *sua sponte* if the losing party has proper notice that the court is considering granting summary judgment and the losing party has a fair opportunity to present evidence." *Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 807 (7th Cir. 2000) (holding that it was not improper for the court to grant summary judgment on seven claims even where the "the motion for summary judgment did not explicitly request relief on the seven claims").

> **a.    Centillion was on notice that the .TXT file was not in the proper format to satisfy the data processing means.**

As in *Goldstein* and *Jones*, Centillion was on notice that summary judgment was under active consideration when it moved for partial summary judgment of infringement. Moreover, Centillion admits that it alleged in its summary judgment motion that the "organized into a format for storage, manipulation, and display" limitation was present in the eBC system. (*See* C.Br.,38.) Specifically, Centillion argued that eBCBO is "programmed to perform all four requirements identified in

the Court's construction of the data processing means structure," including the

requirement of being "programmed to create database tables," and that

> [t]he call_detail.txt file, together with its corresponding call detail.fmt
> file is a "<u>database table</u>". . . . <u>Thus</u>, these "summary reports" . . . are
> <u>organized into a "format for storage, manipulation and display on a</u>
> <u>personal computer</u>."

(A1406-09.)  Qwest addressed this issue in its opposition brief.  "

> (A4063, Material Fact 5.)

> Centillion erroneously states that the "call_detail.txt file, together with
> its corresponding call detail.fmt file is a 'database table' . . ."  Neither
> of these files, individually or in combination, is a database table.

(A4078;A4064, Material Fact 11.)  Thus, Centillion was on notice that the .TXT

file was not in the proper format to satisfy the requirements of the data processing

means.[17]

> **b.**    **The district court granted summary judgment**
>           **because the .TXT file was not in the proper format to**
>           **satisfy the data processing means.**

The district court's summary judgment ruling was based on the fact that the

---

[17] Contrary to Centillion's assertion, C.Br.,38, Qwest properly disputed paragraph
19 of Centillion's Statement of Material Facts Not in Dispute.  (A4060.)  The
eBCBO does not necessarily organize the billing data in the updated billing files
into a format that the eBC client application can utilize.  (A4415,¶ 6.)  Moreover,
the issue of whether eBCBO organizes custom billing information into a format
that the eBC client application running on the customer's PC can merely "utilize"
is distinct from whether the eBCBO organizes custom billing information into
<u>database tables</u> as required by the court's construction.  (A441.)

alleged "data processing means" did not organize the .TXT file (the alleged summary report) into the proper format because it was not a database table; instead, the .TXT file was placed into the requisite database table format on the customers PC:

> the Court concludes that eBC Back Office, LATIS, or a combination thereof, does not "organiz[e] said summary reports into a format for storage manipulation and display on a personal computer data processing means." . . . <u>neither of those systems organize the summary reports into a format for display on a personal computer. Instead, the customer must be provided with a .FMT file and schema within the eBC client application to interact with the .TXT file and allow display of the summary reports</u> on a personal computer. . . .

(A5051-52.)

Further, the district court simply did not, as Centillion contends, assume "infringement would require an .FMT file to 'interact' with a .TXT file *as it is being loaded* into a database within the eBC client application." (See C.Br. at 43 (emphasis added).) To the contrary, the district court followed its claim construction which requires that the "data processing means" create database tables, and the claim requirement that the database tables be transferred from the data processing means to a PC. Creation of the database table on the customer's PC–downstream of and subsequent to the alleged "data processing means"–will not suffice. (A441;A69.)

### c.    Centillion's challenge to the district court's claim constructions is unfounded and untimely.

Centillion argues, C.Br.,25, that the language "format for storage, manipulation, and display" means "the summary reports are organized into a form that is PC-compatible, and . . . the layout of the ASCII text (.TXT) files generated by the back-end of the eBC system satisfie[s] this limitation." This argument ignores the district court's claim construction, pursuant to which the "format for storage, manipulation, and display" includes the requirement that the summary reports be database tables. (A456.) Centillion acknowledged this requirement in its summary judgment briefing:

> [t]he call_detail.txt file, together with its corresponding call detail.fmt file is a "database table". . . . Thus, these "summary reports" . . . are organized into a "format for storage, manipulation and display on a personal computer."

(A1408-09.)

Contrary to Centillion's assertion, C.Br.,27-28 and 44, the district court's construction does not exclude the preferred embodiment. Centillion acknowledges that the district court's infringement analysis applied a claim construction in which "the summary reports are 'properly formatted' for display–not simply organized into a PC-compatible format–prior to being transferred to the PC." (C.Br.,28.) This is wholly consistent with the disclosed embodiment which requires extensive processing by a mainframe to organize the data into database tables (A55,3:57-63,

48

4:28-39) and subsequent additional processing on the customer's PC, where the information "must be decompressed and loaded into a PC database using facilities provided by the user application program according to the invention." (*Id.* at 4:55-63). To the extent other embodiments do not include pre-processing on a mainframe to create database tables, it is irrelevant.[18] See *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("It is often the case that different claims are directed to and cover different disclosed embodiments."); *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1336-37 (Fed. Cir. 2007) ("[A] claim need not cover all embodiments.").

Further, the fact that independent claim 1 does not expressly recite a "database" as found in dependent claim 3 (see C.Br.,43-44) is of no moment. *See Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991)* (concept of claim differentiation cannot override statutory requirement of section 112(6)); *North Am. Vaccine, Inc. v. American Cyanamid Co.*,7 F.3d 1571, 1577 (Fed. Cir. 1993) (rejecting a claim differentiation argument, stating, "The dependent claim tail cannot wag the independent claim dog.").

Finally, the district court issued its Order on Claim Construction prior to

---

[18] The notion that a file (the "Sys-Param" file) in the End-User application disclosed in the specification can further format the data for display (*see* C.Br. at 18-19, 44) is not inconsistent with the specification's disclosure that the summary reports be in a database table format prior to being provided to the customer's PC. (*See* A55,4:28-63.)

Centillion's first appeal in this case.  (A411-458;A1296-A1345.)  Centillion sought

summary judgment applying the district court's claim constructions initially in

2009.  (A5261-63)  Following the district court's first grant of summary judgment

in favor of Qwest, Centillion did not appeal the district court's claim constructions.

As the Court in its Decision on the first appeal noted, "[t]he court's claim

constructions are undisputed."  631 F.3d 1279, 1288.  Centillion has thus waived

any objections to the district court's constructions.  *See SuperGuide Corp. v.*

*DirecTV Enterprises, Inc.*, 358 F.3d 870, 889 (Fed. Cir. 2004) (plaintiff waived its

right to challenge the district court's construction of a term on appeal where it

previously agreed with the court's construction of the term in briefing before the

court); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) (noting

that "the mandate rule precludes reconsideration of any issue within the scope of

the judgment appealed from-not merely those issues actually raised…"); *Ericsson,*

*Inc. v. Harris Corp.*, 146 F. App'x 476, 479 (Fed. Cir. 2005);  *Tronzo v. Biomet,*

*Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001).

> **d.     The alleged eBC "data processing means" does not organize the .TXT file into a format for storage manipulation and display.**

Contrary to Centillion's assertion, C.Br.,28, the .TXT files are not converted

into a "format that is suitable for being loaded into a database on a PC."

Centillion's citations to the deposition of Qwest employee Venkat Ashok are

directed to the creation of .TXT files, and do not support the notion that .TXT files

can be loaded into a database on a PC. (*See* C.Br.,28, citing A1428-29, A2100-

01.)

As the district court properly found, the .TXT file did not satisfy the

formatting requirements of the data processing means:

> the Court concludes that eBC Back Office, LATIS, or a combination
> hereof, does not "organiz[e] said summary reports into a format for
> storage manipulation and display on a personal computer data
> processing means." . . . Instead, the customer must be provided with a
> .FMT file and schema within the eBC client application to interact
> with the .TXT file and allow display of the summary reports on a
> personal computer.

(A5051-52.) The Court's reasoning reflects that the .TXT file is not a database

table; there is no evidence the alleged data processing means (LATIS and/or

eBCBO) organizes the .TXT file into a format for storage manipulation and

display. *Id.*

In its summary judgment briefing, Centillion argued that the "call_detail.txt

file, together with its corresponding call_detail.fmt file is a 'database table' . . ."

(A1408,24.) These assertions are simply incorrect under the facts in the record.

Neither of these files is a database table. (A4272-73,38:4-9,41:8-42:15; A4188.)

A database table is a container for data with columns and integrated schema.

(A4297,255:1-6, 16-19.)

A4272-

73,41:21-42:2.]

(A4272,41:8-20),                                        (A4272-73,41:8-42:5.)

Thus, neither the call_detail.TXT file nor the call_detail.FMT file is a database

table.

Moreover, these two files cannot by themselves be combined to make a

database table.


(A4272-73,40:24-41:7;A4276,56:13-57:18.)  If the file pair already

constituted a database table, there would be no reason to create a separate database

table and populate the data from the file pair -- the database populated with the

data from the file pair would be redundant.

Centillion's belief, as evinced in its summary judgment briefing, that the

.TXT and .FMT file pair is a database table is apparently based on an incorrect

understanding of how the file pairs are generated.  Centillion's expert, Dr. Grimes,

stated his opinion that the file pairs are created from database tables stored in the

eBC Back Office.  (A4274,48:16-49:7.)  He was mistaken as to the predicate for

this opinion, as the file pairs are not created from existing database tables.

(A4262,531:19-532:3 (                                                ).)

Centillion has been unable to point to any evidence to the contrary.  (*See* A4274-

75, 49:16-50:18.)

Not only do the .TXT and .FMT file pairs not represent a database table, the two files do not even come from the same source.

(A4415,¶6,A819,¶4.)

Nor can Centillion argue that having the database tables created on the user's PC is a structural equivalent, since that would eliminate the claim "means for transferring" the summary reports from the "data processing means" (at system back-end) to the "personal computer data processing means" (at the user front end). *See Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008) ("Any other construction of [the term 'as is being transferred'] would vitiate the meaning that we previously gave to the term "storage" in *Hilgraeve I* and *Hilgraeve II*.")

### e. Centillion's proffered evidence fails to create an issue of material fact as to whether the .TXT file is in a "database table" format.

Centillion, in its summary judgment briefing, contended that that the call_detail.TXT file together with its corresponding call_detail.FMT file is a database table.  (A1379.)  In support, Centillion mischaracterized the Qwest Alternate Media Support Group Training Manual.  (*See* A4735, citing Centillion's expert Dr. Grimes at A4752-53.)  The manual refers to "

(*See* A1889.)   Nowhere, however, does the manual equate

to "database tables," and Centillion's own expert admitted as much, recognizing the distinction between files that might be loaded into a database table, and the database table itself.

Centillion' argument – that because the "tables" in the zip files are "intended" to be loaded into database tables in the eBC application database, "there is no other meaning . . . than that these tables are database tables" – is factually and logically unsupported. Even if the "tables" in the .TXT files could only be used to populate "database tables," there is no logical basis for equating the two: the fact that "A" (*e.g.*, a slice of bread) may be intended to be loaded into "B" (*e.g.*, a toaster) does not turn "A" into "B."[19]

Notably, *Centillion's expert admitted that "the .txt file is technically data for a database table, rather than a table per se."* (A4753,¶7 (emphasis added).) Thus, Centillion's expert admits that a .TXT file is not a database table. Centillion's expert also acknowledged that an

. (A4276,57:9-18.) Importantly, and as Centillion's

_____

[19] Centillion's expert, Dr. Grimes also mischaracterizes Venkat Ashok's Oct. 17, 2011 Declaration. (*See* A4415,¶6.) According to Dr. Grimes, Mr. Ashok declared that database tables are created directly from an XML stream. (A4753,¶8, citing A4415,¶6. In fact, Mr. Ashok declared that the.TXT files are created from data in the XML stream, but in no way suggested that such files are database tables.

expert acknowledged,

(A4271-72,37:12-13 (.TXT),41:21-24 (.FMT).)

(A4273,44:4-6),

(A4276,56:13-57:18.)  Centillion's expert agreed

that Qwest's eBC client application software, when downloaded into a user's

computer, is what creates a "database table," albeit an empty one, that can then

receive .FMT and .TXT files from Qwest's back office system.  The .FMT and

.TXT files cannot, either alone or in combination, create a database table.

Centillion cannot now create an issue of fact by offering contradictory expert

testimony that the .FMT and .TXT files – *i.e.*, the "tables" contained in the zip files

from Qwest – are "database tables."    "[W]here a deposition and affidavit are in

conflict, the affidavit is to be disregarded unless it is demonstrable that the

statement in the deposition was mistaken . . .." *Amadio v. Ford Motor Co.*, 238

F.3d 919, 926 (7th Cir. 2001) (internal quotation omitted); *cf. E.E.O. C v. Yellow*

*Freight Sys., Inc.*, 253 F.3d 943, 952 (7th Cir. 2001) ("As a general rule, the law of

this circuit does not permit a party to create an issue of fact by submitting an

affidavit whose conclusions contradict prior deposition or other sworn testimony.")

(internal quotation omitted).  Any suggestion in Centillion's expert's declarations

that the .FMT and .TXT files can, alone or in combination, constitute a database

table should be disregarded.  See *Id*.

55

(A4188.)

(A4276-A4277,57:24-58:19.)  The eBC .TXT files do not constitute "a collection of analyzed and/or reorganized data" and therefore cannot be the claimed summary reports.

Further, the claimed "summary reports" must be in the form of database tables.  (*See* A441.)  Because the .TXT files are not database tables, the .TXT files cannot be the claimed "summary reports".

### C.    The District Court Did Not Abuse Its Discretion in Awarding Qwest's Costs Pursuant to 28 U.S.C. 1920.

#### 1.    Centillion must prove that the district court abused its discretion in determining the amount of costs.

Federal Rule of Civil Procedure 54(d) provides that "costs—other than attorney's fees—should be allowed to the prevailing party."  Pursuant to 28 U.S.C. § 1920, a judge or clerk of any court of the United States may tax as costs the following: fees of the clerk; costs for printed or electronically recorded transcripts necessarily obtained for use in the case; and fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case.  The district court has broad discretion in determining whether and to what extent costs may be awarded and there is a strong presumption in favor of

awarding costs to the prevailing party. *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 430 (7th Cir. 1989); *Barber v. Ruth*, 7F. 3d 636, 644 (7th Cir. 1993).  The district court is not required to go into great detail to explain its rationale in awarding costs; in *Cengr v. Fusibond Piping Systems*, 135 F.3d 445, 454 (7th Cir. 1998) ("even the most brief justification for the award of costs" is appropriate.)

The appellate Court's review should bear in mind that there is a heavy presumption in favor of awarding costs to the prevailing party. *Majeske v. City of Chicago*, 218 F. 3d 816, 824 (7th Cir. 2000).  While the Court must evaluate whether there is statutory basis for allowing a particular item, the Court should not overturn a district court's decision that the cost was necessary to the litigation or its determination of what amount is reasonable absent a showing of clear abuse of discretion. *Id.*; *see also Cengr*, 135 F.3d 445 at 453.  The district court is in the best position to determine whether costs sought by a prevailing party were necessary to litigation and/or reasonable. *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 945 (7th Cir. 1997); *Cengr*, 135 F.3d 445 at 453; *Majeske*, 218 F. 3d 816 at 824.

Centillion carries the burden of proof to show that the district court abused its discretion.  *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1409 (7th Cir. 1991); *see also In re Ricoh Co., Ltd. Patent Litigation*, 661 F. 3d 1361, 1364 (Fed. Cir. 2011).

### 2. The district court properly held that the costs requested by Qwest were recoverable under 28 U.S.C. § 1920 and provided sufficient explanation of its rationale.

Centillion does not dispute that the categories of costs Qwest sought to recover (i.e., "fees for service of summons and subpoena," "fees for printed or electronically recorded transcripts necessarily obtained for use in the case," and "fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case") were within the purview of 28 U.S.C. § 1920.  Instead, Centillion accuses the district court of an "unexplained award of costs" and failing to make findings that the costs were necessary and/or reasonable. (C.Br.,55-56.)

But the district court's Order did explain its findings.  The district court held that the "costs previously entered [were] not unreasonable."  The district court further held that the photocopying expenses were recoverable as they were "necessary to litigate its case" which had been "pending for 9 years" and was "paper intensive;" and those expenses were "supported by [Qwest's] proffered breakdown."  (A5128.)  Finally, the district court held that the deposition expenses were recoverable as they were "necessary to the case" and "supported by [Qwest's] filings."  (*Id*.)  Thus, the district court provided a sufficient explanation of its rationale in awarding costs.

### 3.   Qwest properly substantiated its request for costs.

#### a.   Requirements to Substantiate Request for Photocopy/Imaging/Printing Costs

28 U.S.C. § 1920 does not require tracking the identity of each and every photocopied document and explaining how it was necessary for purposes of the action.  In *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991), the Court held that the only requirement is to provide the "best breakdown obtainable from retained records." The Court rejected the contention that the prevailing party's photocopying expenses lacked proper documentation because the party failed to identify any document copied, the number of copies made of each original, or the copying cost per page.  The Court further stated that "that a copying bill of more than $50,000 was large, but found that it was not excessive 'in the context of a six-year paper war.'" *Id.* at 643 n.13 (citations omitted).

In *Summit Technology, Inc. v. Nidek Co., Ltd*, 435 F.3d 1371, 1378 (Fed. Cir. 2006), the Court observed that "in complex patent litigation involving hundreds of thousands of documents and copies, parties cannot be expected to track the identity of each photocopied page along with a record of its relevance to the litigation."  The Court further observed that § 1920 does not demand page-by-page precision but calculation that is reasonably accurate under the circumstances. *Id.* at 1380.

## b. Requirements to Substantiate Request for Court Reporter/Transcription Costs

Recovery of deposition costs requires a showing that the deposition was "reasonably necessary to the case at hand at the time it was taken, not whether it was used in a motion or in court." *See Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 455 (7th Cir. 1998). Reasonable necessity is considered in light of the facts at the time the deposition was taken without regard to intervening developments that render the deposition unneeded for further use. *Hudson*, 758 F.2d 1237, 1253 (7th Cir. 1985) overulled on other grounds.

Qwest can recover costs for both the cost of video-recorded deposition and the cost of stenographically transcribing the same deposition, as long as both were reasonable and necessary. *Halasa v. ITT Educ. Services, Inc.*, 1:10-CV-437-WTL-MJD, 2012 WL 639520 (S.D. Ind. Feb. 27, 2012) *aff'd,* 690 F.3d 844 (7th Cir. 2012) *citing Little v. Mitsubishi Motors N.A., Inc.,* 514 F.3d 699 (7th Cir.2008).

## c. Qwest's Requests for Costs Were Properly Substantiated.

Qwest provided the best breakdown of its costs incurred and obtainable from its retained records and invoices as is required in this jurisdiction.  Qwest filed its Bill of Costs utilizing the Southern District of Indiana's AO Form 133 and sought costs for "fees for service of summons and subpoena," "fees for printed or electronically recorded transcripts necessarily obtained for use in the case," and

"fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." (A1281-95.) Qwest included Attachments A and B which provided a detailed itemization of the costs incurred for court reporter and transcription costs and a detailed itemization of the costs incurred for photocopies, imaging, and printing. (A1284-95.) Those Attachments included information regarding the date, vendor/provider, invoice number, description, and amount of cost incurred. The "description" category contained a summary of services provided by outside vendors that was taken directly from each invoice. For costs associated with in-house copies, the itemization also included additional detail regarding the specific attorney who authorized the photocopies to be made. Qwest's attorney, Vincent Belusko, signed a declaration certifying that the "costs [were] correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed." (A5123-24.)

Qwest's Response to Centillion's November 5, 2012 Motion to Reconsider and to Amend the Judgment Entered on October 30, 2012 (A5116-122.) included a supplemental Declaration of Vincent Belusko with additional information regarding the costs incurred by Qwest. That Declaration stated that the case had been ongoing for nine years, the parties engaged in a discovery war precipitated by Centillion's broad discovery requests which encompassed numerous accused

systems, 939 documents had been filed with the Court, Qwest produced over three million pages of documents, and the bill of costs accurately reflected the information contained in Qwest's records and invoices. The Declaration also provided the average costs per page for black and white and color copies in house and for outside vendors. (A5124.)

Centillion's complaints regarding copying charges (C.Br., 57) are unfounded. First, as set forth in *Northbrook*, Qwest is not required to indicate the purpose of each type of photocopy – this would be too onerous given the nine year history of this action and the volume of documents exchanged in the discovery process and submitted to the district court. Qwest is also not required to demonstrate that all photocopies were related to presenting evidence to the Court; the standard is that the photocopies were necessary to the case. Qwest has demonstrated that all photocopies for which it seeks to recover costs were necessary to the case through Qwest's Bill of Costs declaration which provides that all costs were "necessarily incurred in this action."

Second, although not required, Qwest provided information regarding the rates charged in-house and by outside vendors for black and white and color photocopies. These rates in conjunction with the total invoice amount can be used to calculate a general estimate of the number of copies made. (A5123-24.)

Centillion also takes issue with specific copying items that allegedly "appear

63

objectionable on their face", including the "Database Management", "expert review" and "deposition preparation." Centillion further asserts that the district court cannot tax the costs of transcripts provided merely for the convenience of the requesting attorney. Centillion did not raise these arguments in the district court and has therefore waived these arguments for purposes of this appeal. *See,* e.g., *Local 15, Int'l Broth. of Elec. Workers, AFL-CIO v. Exelon Corp.,* 495 F.3d 779, 783 (7th Cir. 2007) ("A party waives any argument that it does not raise before the district court…"); *Garlington v. O'Leary,* 879 F.2d 277, 282 (7th Cir.1989).

Even if the Court finds that Centillion did not waive these arguments, Centillion's arguments are without merit. First, Qwest's recovery of costs for *managing* a database, i.e., vendor costs in managing the importation of electronic and paper documents into a database to support review, tagging, and preparation of documents for production in the agreed format between the parties are recoverable. *See Halasa v. ITT Educ. Services, Inc.,* 1:10-CV-437-WTL-MJD, 2012 WL 639520 (S.D. Ind. Feb. 27, 2012) *aff'd,* 690 F.3d 844 (7th Cir. 2012) *citing Hecker v. Deere & Co.,* 556 F.3d 575, 591 (7th Cir.2009) (costs for converting computer data into a readable format in response to plaintiffs' discovery requests are recoverable under § 1920). Further, these costs are one line item in an invoice for numerous photocopying charges, including conversion and printing of TIFF files, bates labeling and confidentiality labeling of documents for printing and

photocopying and creation of DVDs.

Second, photocopies made for Qwest's expert and for a deposition are clearly recoverable because they fall within a statutorily authorized category (i.e., §1920(4)).

Third, Centillion failed to show how any of the transcripts itemized in Exhibit A to the bill of costs are charges for "convenience." The detailed chart summarizing the court reporter/transcription costs demonstrates that Qwest sought to recover costs for original, certified, or video copies of depositions which clearly fall within a statutorily authorized category (i.e., 1920(2)), were necessarily incurred, and reasonable.

### 4. Centillion's Procedural Error Arguments are Meritless.

Centillion argues that the district court's November 20, 2012 Order was "procedurally improper" because the Court awarded Qwest costs (1) before the clerk had taxed costs and (2) before Centillion had an opportunity to raise specific objections.

First, it was procedurally proper for the district court to tax costs because the district court has inherent authority to tax costs. *See* case law and arguments set forth in Section II "The Court has Inherent Power to Tax Costs" of Qwest's Response to Centillion's Motion to Reconsider and to Amend the Judgment Entered on October 30, 2012 (A5127-28.)

65

Second, Centillion's assertion that the district court awarded Qwest costs before Centillion had an opportunity to raise specific objections is simply unsupported.  In its November 20, 2012 Order, the district court stated that it "agree[d] with Centillion that it should reconsider the entry of costs in light of Centillion's objections" and in its analysis of costs stated "[h]aving considered Centillion's objections."  (A5128.)  Centillion had an opportunity to raise the specific objections to Qwest's Bill of Costs and the district court did review the specific objections made by Centillion in its Motion to Reconsider.

## VII.  CONCLUSION

For the reasons set forth above, this Court should affirm the district court's judgment of non-infringement.  Non-infringement is supported by the absence of the "as specified by a user limitation" alone for both LOGIC and eBC, but in addition, as the district court determined, summary judgment is separately appropriate based upon the absence of the "data processing means" element and

the required function and structure of this element.  Finally, the award of costs

should be affirmed in all respects.

Dated:        April 25, 2013

                                Respectfully submitted,


                                */s/ Vincent J. Belusko*
                                Vincent J. Belusko
                                Morrison & Foerster LLP
                                555 West 5th Street, Suite 3500
                                Los Angeles, CA 90013
                                P:     (213) 892-5200
                                F:     (213) 892-5454

                                *Attorneys for Defendants-Appellees*
                                *QWEST COMMUNICATIONS INTERNATIONAL,*
                                *INC., QWEST CORPORATION, AND QWEST*
                                *COMMUNICATIONS CORPORATION*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, pursuant to Fed. R. App. P. 25 and Fed. Cir. R. 25(c), I electronically filed the foregoing using the Court's CM/ECF filing system on this 26th day of April, 2013. Counsel for Appellant Centillion Data Systems LLC were electronically served by and through the Court's ECF system, via email, and by U.S. Mail pursuant to Fed. R. App. P. 25.

<div style="margin-left:40%">

*/s/ Vincent J. Belusko*
Morrison & Foerster LLP
555 West 5th Street, Ste. 3500
Los Angeles, CA 90013-1024
(213) 892-5200
VBelusko@mofo.com

</div>

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

<u>X</u>      this brief contains 13,930 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

___      this brief uses a monospaced typeface and contains [state the number of lines] of text, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6) because:

<u>X</u>      this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 Point, Times New Roman, or

___      this brief has been prepared in a monospaced typeface using [state name and version of word processing program][ with [state number of characters per inch and name of type style].

*/s/ Vincent J. Belusko*
Vincent J. Belusko

Attorney for Appellees,
*Qwest Communications International, Inc., Qwest Corporation, and Qwest Communications Corporation*

Date: <u>April 26, 2013</u>